**NORTHERN PACIFIC RAILWAY COMPANY**

v.

**The UNITED STATES.**

No. 319-59.

United States Court of Claims.

Jan. 21, 1966.

Louis A. Harris, St. Paul, Minn., attorney of record, for plaintiff.

Lewis A. Dille, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to former Rule 45(a) (now Rule 57(a)) to Trial Commissioner Roald A. Hogenson, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on May 7, 1964. The plaintiff has excepted to the opinion and certain of the findings of fact. Defendant has requested that the court adopt the opinion and findings of fact. The parties have filed briefs and the case has been submitted to the court after oral argument of counsel. The court agrees with the commissioner's findings, his opinion and his recommended conclusion of law, as hereinafter set forth, and hereby adopts the same as the basis for its judgment in this case. Plaintiff is not entitled to recover on its petition and defendant is not entitled to recover on its counterclaim. Therefore, the petition and counterclaim are dismissed.

OPINION OF COMMISSIONER

This is a suit for additional charges in the alleged amount of $315,115.32 for the transportation by plaintiff railroad of numerous intrastate shipments of manganese ore for defendant from Philipsburg, Montana, to Butte, Montana, in 1953, 1954, 1955, and 1958. Under paragraph 14 of Appendix B of the rules of the court, the parties selected 65 representative Government bills of lading on which to try the issues of liability, reserving the determination of amount of recovery, if any, for further proceedings.

The manganese ore was purchased by defendant in a stockpiling program instituted by Executive Order of the President pursuant to the Defense Production Act of 1950, 64 Stat. 798, enacted to encourage exploration, development, and mining of critical and strategic minerals and metals and to provide for their purchase and stockpiling by the Government to promote the national defense and in support of national security. Administration of the stockpiling program was duly delegated to the General Services Administration which issued special regulations for the purchase of domestic manganese ore at Butte and Philipsburg, Montana. The stated purpose of the program was to obtain from marginal or submarginal sources manganese ore which would not be otherwise produced, with the reservation that the Government could exclude presently established production of manganese ore from participation in the program.

Minimum specifications and requirements of manganese ore to be purchased under the program were established by

the GSA regulations. When these were met, defendant settled with the participants in the program, either by payments in accordance with a price schedule based on the percent of manganese contained in the ore, or on the basis of a price of $2.30 per long ton unit (22.4 pounds) of the recoverable manganese in the ore, subject to premiums and penalties and a flat treatment and handling charge of $16.60 per long ton. The average amount paid to the sellers of the ore in the 65 representative shipments was $24.96 per short wet ton. The necessary assay and recoverability tests were performed at Butte, Montana, after delivery of the shipments.

At all times pertinent in this case, there were no known major sources of high grade manganese ore in the United States. To obtain substantial amounts of manganese from domestic ores, such metal would have had to be extracted from low grade ores like those in the pertinent shipments. During the time of the shipments, the market value of commercial manganese ore varied from 60 to 65 cents per long ton unit, with the manganese content of such marketable ore ranging from 44 to 50 percent, as contrasted with the above-stated incentive price of $2.30 per long ton unit, paid by the defendant for low grade ores which had an average manganese content of only 23.4 percent.

The ores in the pertinent shipments had no market value and could not have been sold at any price other than to the defendant at incentive prices under the stockpiling program.

The shipments moved from Philipsburg on commercial bills of lading, prepared by the sellers of the ore, signed by plaintiff's agent there, containing notations that they were issued in lieu of Government bills of lading, and later exchanged at Philipsburg for Government bills of lading signed for plaintiff by the same agent.

All of the Government bills of lading contained one of the following notations: "Subject to Condition 5," or "Value subject to Condition 5," or "Value subject to Condition 5 on reverse of B/L."

All but six of the commercial bills contained notations that valuation was as provided in Condition 5 of Government bills of lading.

Condition 5 was set forth on the reverse side of each Government bill of lading under the caption "General Conditions and Instructions," as follows:

It is mutually agreed and understood between the United States and carriers who are parties to this bill of lading that * * *

    *    *    *    *    *    *

5. This shipment is made at the restricted or limited valuation specified in the tariff or classification at or under which the lowest rate is available, unless otherwise indicated on the face hereof.

At the time of the shipments involved in this case, plaintiff maintained commodity rates per short ton based on the value per short ton of manganese ore transported in carload lots in Montana intrastate commerce from Philipsburg to Butte, published in Northern Pacific Railway Company Freight Tariffs 136–H and 136–I. These rates varied from 116 cents to 402 cents per short ton on valuations ranging from $10 to $100 per short ton. The rates effective prior to May 1, 1954, on ore values of not over $10 and not over $15 were respectively 116 cents and 250.7 cents, as provided in Items 90–E and 83–B of Supplement 36–B to NP Tariff 136–H. Effective on and after May 1, 1954, such rates on the same two ore values were respectively 180 cents and 250.7 cents, as provided in Items 180 and 165 of NP Tariff 136–I.

On 9 of the 65 representative shipments, which 9 occurred in 1953 and 1954, plaintiff billed and defendant paid freight charges at the commodity rate of $2.507 per short ton, the rate provided for on ore value not over $15 per short ton in Item 83–B, Supplement 36–B, NP Tariff 136–H.

On 37 more of the representative shipments, occurring in 1954 and 1955, plaintiff billed and defendant paid freight charges at the commodity rate of $1.80

per short ton, the rate provided for on ore value not over $10 per short ton in Item 180 of NP Tariff 136–I. The remaining 19 representative shipments occurred in 1958.

In 1956, upon a postaudit, plaintiff considered that reference to Condition 5 of the Government bill of lading did not satisfy the commodity tariff requirements concerning certification of ore values, contained in Item 70–E of NP Tariff 136–H and Item 100 of NP Tariff 136–I, quoted in finding 8.

Other than the reference to Condition 5 on the commercial and Government bills of lading, plaintiff had not received any statement of value of the ore shipments, and requested but did not receive proof of value from the General Services Administration. Plaintiff then issued supplemental freight bills to defendant on all of the preceding shipments based on the Montana intrastate Class D rate, provided in Consolidated Freight Classification Nos. 20 and 21, NP Tariffs 717–N and 717–O, and thereafter billed defendant on all of the 1958 shipments on the basis of such class rates. The defendant, however, paid for the 1958 shipments only on the commodity rate for ore of a value not over $10 per ton.

The Class D rate is 33 cents per 100 pounds or $6.60 per short ton, equivalent to a commodity rate on ore valued at $250 per ton, and is applicable on the pertinent shipments if defendant is not entitled to the commodity rates.

Defendant's counterclaim is based upon payments of freight charges on some of the shipments at a rate for ore of a value in excess of $10 per ton.

Plaintiff's contention is that it is entitled to application of the Class D rate to all of the shipments because defendant failed to comply with the rules governing application of commodity rates on manganese ore in NP Tariffs 136–H and 136–I. It is not disputed that such rules control the application of the commodity rates, but rather whether there was compliance with the rules on the matter of certification of ore value. On manganese ore shipments between Philipsburg

and Butte, Exception 2 of the commodity tariff rules specifically provided:

* * * When shipper is properly prepared to and does furnish certificate of value at point of origin acceptable to carrier, rates will be assessed on value so certified by shipper. * * *

The rules, as they pertain generally to ores and concentrates, provided that the carrier would waybill ore shipments at rates applicable to a valuation of $100 per ton, or at the rate applicable for the highest value shown, subject to the following:

(a) After arrival at smelter or other industry to which shipment is consigned and settlement between shipper and consignee is made on basis of return or assay by said smelter or industry, the value so determined and upon which such settlement is made * * * without deduction for freight charge, shall be certified to the carrier, and rate shall be revised in accordance with such certified value.

It is beyond dispute that the incentive prices paid by defendant to its suppliers of manganese ore could not have been and were not certified to plaintiff by the Government's suppliers at point of origin of the shipments, and that such prices were determined on the basis of assay and recoverability tests performed after delivery of the ore shipments at Butte. Such prices were never certified to plaintiff.

Plaintiff's position is that the incentive prices were the value to be certified under the commodity tariff rules, and that lack of certification of such value, either at point of origin or after delivery and testing, made the commodity tariffs inapplicable. Defendant claims that the value referred to in the tariff is the commercial market value, that the reference on the bills of lading to Condition 5 was a certification of value "acceptable to carrier" at point of origin, and that since such ores had no market value, defendant was entitled to the lowest commodity rate, or that provided for manga-

nese ore of a value not over $10 per short ton.

The initial question in this case thus becomes the correct interpretation of the term "value" as used in the commodity tariff rules. The ordinary meaning of value is market value, or the fair price reached by a buyer and seller, both willing to act, and both informed about the open market. In the sale of ores, value contemplates the commercial price reasonably to be paid upon consideration of the costs which will be incurred to produce therefrom a metal which can be profitably used or marketed. Hard reality forces one to conclude that assays and other ore tests in the smelting industry are directed to such commercial determinations, and that the term "value" in the commodity tariff rules means the commercial or market value as determined by the "settlement between shipper and consignee * * * made on basis of return or assay by said smelter or industry." Reasonable construction of the term "value" requires rejection of the contention that the artificially created incentive prices under the stockpiling program constituted the values of the ores. Proper rules of construction should not permit the unusual facts of this case to bring about a result which is contrary to the ordinary meaning of the term value and to the basic principle of commodity tariffs to fix rates on the actual value of the article shipped.

The issue then arises whether the requirement of the commodity tariff rules was met that the ore value be certified to the carrier. Under the facts of this case it must be inferred that both the shipper and the carrier were informed of the nature of the Government's program of stockpiling manganese ores, and that it was well known that such ores were marginal and submarginal, were not otherwise marketable, and had no commercial value. In accordance with the above-quoted Exception 2 to the commodity tariff rules, each shipper was "properly prepared" to certify at Philipsburg that the ore was of a value not over

$10 per short ton. No form of certification is prescribed in such rules, and in Exception 2, the only requirement is that it be "acceptable to carrier."

During the first 3 years of the shipments, it was obviously "acceptable to carrier" that the notation on the various bills of lading referring to Condition 5 was a certification of value. Although the tariff rule provides that the carrier would waybill at a value of $100 per short ton in the absence of certification of value by the shipper at point of origin, plaintiff waybilled during the first 3 years on values not over $10 per short ton on most shipments, and on others at $15 per ton, but on no shipment at a value of $100 per ton. While waybilling is an internal function of the carrier, each waybill carried the Condition 5 notation, and in reliance upon such notation as certifying value, plaintiff assessed commodity rates and billed defendant accordingly during the first 3 years. It is thus clear that both parties considered the Condition 5 notation as a certification of value, and accordingly, it is ruled that there was substantial compliance with the commodity tariff rules. Union Pac. R. R. v. United States, 172 F.Supp. 668, 145 Ct.Cl. 619 (1959).

Plaintiff relies on Capital Compressed Steel Co. v. Chicago, R. I. & Pac. R. R., 183 F.2d 691 (10th Cir. 1950), cert. denied, 340 U.S. 905, 71 S.Ct. 281, 95 L.Ed. 655 (1950); and Dulien Steel Products, Inc. v. New York, N. H. & H. R. R., 287 I.C.C. 386 (1952) as precedents for holding in this case that there was a failure to comply with the commodity tariff rules. Unlike the circumstances in this case, however, there were no facts in either of the cited cases which would permit a holding that there was substantial compliance with the express requirements of the tariff rules involved in those cases.

Item 180 of NP Tariff 136–I, and its predecessor, Item 90–E, Supplement 36–B, NP Tariff 136–H, pertained to ore of a value not over $10 per short ton and provided the lowest rates under the pertinent commodity tariffs. Applicable in

other respects, these rates would be applied to the shipments in suit only if the special provisions of such items were met that they applied only to ore "to be smelted" at Butte or East Helena, Montana, under Item 180, or at Anaconda, Butte, or East Helena, Montana, under Item 90–E.

The manganese ores were stockpiled upon delivery at Butte, Montana, where they have remained without being treated or processed in any way. No smelting plant has existed at Butte since 1920, but there have been at all pertinent times adequate plant facilities at Butte to process the stockpiled ore by flotation and nodulization, which processes are important steps in the preparation of ores for the smelting of the metal from concentrates. Transit privileges available to the defendant at the time of these shipments were for testing, grinding, flotation, or nodulizing, and all of the shipments were recorded for transit.

Plaintiff knew at the time the commodity tariffs were published and the pertinent shipments moved that metal could not be separated from ore by smelting at Butte, Montana. To give practical meaning to the tariff requirement, it is reasonable to conclude that it was intended that the language "to be smelted" at Butte meant to be subjected to the preparatory smelting processes of flotation or nodulization available at Butte, Montana. As the requirement that the ore is "to be smelted" is one of intention at the time of the shipments, it is immaterial that the ores have not been processed even to this time, as the purpose of the Government procurement meets the requirement of Items 180 and 90–E of the commodity tariffs.

■ The record in this case shows that there were some shipments on which plaintiff billed and defendant paid commodity rates on ore values not over $15 per short ton. Defendant, however, has failed to sustain its burden of proof on its counterclaim to show the facts and circumstances on such shipments, which would entitle defendant to recover any of the charges claimed to be excessive.

It is my opinion that plaintiff is not entitled to recover on its petition, that defendant is not entitled to recover on its counterclaim, and that judgment should be entered accordingly.